IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JANE PUGLIESE

v.                                    C.A. NO. 12-7073

COUNTY OF LANCASTER, et al.

FILED

JAN 27 2016

MICHAEL KUNZ, Clerk

MEMORANDUM OPINION

SCHMEHL, J.                                    JANUARY 27, 2016

Plaintiff brought this action, claiming the elimination of her position by the defendants

violated her First Amendment rights for protection from retaliation for freedom of speech and

political association as well as the Equal Protection and Due Process Clauses of the Fourteenth

Amendment (Count I), Title VII of the Civil Rights Act of 1964 (Count II), the Age

Discrimination in Employment Act (Count III) and the Pennsylvania Human Relations Act

(Count IV). On January 8, 2014, plaintiff voluntarily withdrew her age discrimination claims in

Counts III and IV. On April 8, 2014, plaintiff, pursuant to stipulation, voluntarily withdrew her

individual claims against individual defendants Craig Lehman and Dennis Stuckey. Presently

before the Court is the defendants' motion for summary judgment on the remaining claims. The

Court held oral argument on the motion on July 14, 2015. For the reasons which follow, the

motion is granted.

**STANDARD OF REVIEW**

Summary judgment is appropriate if there is no genuine dispute as to any material fact

and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A motion

for summary judgment will not be defeated by 'the mere existence' of some disputed facts, but will be denied when there is a genuine issue of material fact." Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 581 (3d Cir. 2009)(quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986)). A fact is "material" if proof of its existence or non-existence might affect the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

In undertaking this analysis, the court views the facts in the light most favorable to the non-moving party. "After making all reasonable inferences in the nonmoving party's favor, there is a genuine issue of material fact if a reasonable jury could find for the nonmoving party." Pignataro v. Port Auth. of N.Y. and N.J. , 593 F.3d 265, 268 (3d Cir. 2010) (citing Reliance Ins. Co. v. Moessner, 121 F.3d 895, 900 (3d Cir. 1997)). While the moving party bears the initial burden of showing the absence of a genuine issue of material fact, meeting this obligation shifts the burden to the non-moving party who must "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250.

The following facts are either undisputed or viewed in the light most favorable to plaintiff:

1. Under Pennsylvania law, the County of Lancaster ( the "County") is classified as a County of the third class.

2. The governing body of the County consists of a board of three County Commissioners who are each elected at large for a term of four years. (16 Pa. Cons. Stat § 401).

3. Since January 1, 2008, the Board of Commissioners of the County has been comprised of defendant Scott Martin ("Martin"), Dennis Stuckey ("Stuckey"), and Craig Lehman

2

("Lehman"). (Cowley Dep., 136).

4. Martin and Stuckey are registered Republicans and comprise the majority members of the Board of Commissioners, and Lehman is a registered Democrat and the minority member of the Board of Commissioners. (Lehman Dep., 7, 8).

5. Martin became the Chairman of the Board of Commissioners on January 1, 2010.

6. The Board of Commissioners are empowered to enact and enforce ordinances and resolutions, adopt budgets, make appropriations, levy taxes, incur debt and direct the administration of county government. (16 Pa. Cons. Stat. § 509(a)).

7. The County government is divided into several Departments.

8. The Department of Planning combines county policies with federal and state planning responsibilities to support the application of countywide plans for the future.

9. Up until 2011, the Department of Planning was comprised of four Divisions—Housing and Economic Development Planning, Transportation Planning, Community Planning, and Heritage and Long-Term Planning. (Pugliese Dep., 63-64).

10. The heads of the four Divisions were plaintiff, Housing and Economic Development Planning; David Royer ("Royer"), Transportation Planning; Frank Behlau ("Behlau"), Community Planning and Scott Standish ("Standish"), Heritage and Long-Term Planning. (Cowhey Dep., 61). Plaintiff was the sole female division director.

11. Defendant James Cowhey ("Cowhey") has served as Executive Director of the Department of Planning since 2005. (Cowhey Dep., 183). Cowhey is a Democrat.

12. The Executive Director is a "leadership professional, administrative and supervisory position, which is responsible for all activities and work programs of the Lancaster County

3

Planning Commission." (ECF 41-15). The Executive Director reports to the Board of

Commissioners. (Id.).

13. In addition, this position assists the Board of Commissioners "in establishing policies,

plans and ordinances dealing with the future of Lancaster County." (Id.).

14. Cowhey's duties as Executive Director included "[b]udgeting, personnel

management, really oversight of the department as a whole, [and] policy development." (Cowhey

Dep., 185).

15. Cowhey recruited and ultimately hired plaintiff on July 17, 2006 to serve as the

Director of Housing and Economic Development Planning. (Cowhey Dep., 119). At all times,

Cowhey was plaintiff's direct supervisor.

16. As stated in the job description for Director of Housing and Economic Development

Planning:

> The Director for Economic Development Planning is responsible for the economic
> development planning programs of the Commission. . . This is a unique position
> that combines the practice of urban planning with the practice of economic
> development. . . The Director ensures that the policy directives and initiatives of
> the Executive Director, the Planning Commission, and the Board of County
> Commissioners are carried out in an expeditious and cost effective manner. . . The
> Director for Economic Development Planning performs work subject to the
> periodic evaluation of approved goals and performance by the Executive Director.

(ECF 41-16).

17. Among the specifically enumerated essential functions as Director for Economic

Development Planning are:

> Coordination of Lancaster County planning and growth management policies with the

4

economic development initiatives of local governments, community development organizations, and economic development and business improvement organizations;

Provide assistance to municipalities and community development organizations in developing and carrying out economic development planning initiatives and programs that are consistent with adopted county policy;

Attends a wide variety of public and other meetings, and advises the County Planning Commission, the Board of County Commissioners, municipal officials, and other public officials and private interests on county-wide planning matters;

Advises public and private sectors in developing new planning concepts, plans, projects or programs;

Prepares and delivers speeches, articles, reports and other presentations dealing with economic development planing in the context of the Lancaster County Comprehensive Plan[.]

(ECF 41-16).

18. Cowhey's hiring letter specifically stated that Plaintiff was hired based on her

expertise in economic development planning:

It is my pleasure to offer you the position of Director for Economic Development Planning. .
You are uniquely qualified for this job and showed a clear understanding of the Commission's role in economic development planning for the county. Additionally, I was impressed with your grasp of the need for an economic development plan for the county that will form the framework for the work of economic development practitioners. I know that you will be [a] strong advocate and partner for economic sustainability and revitalization in Lancaster County. I look forward to working with you.

(ECF 41-18).

19. Plaintiff married local attorney Gregory Paulson ("Paulson") on December 27, 2008.

(Pugliese Dep., 8).

20. Defendant Cowhey and Division Director Standish attended plaintiff's wedding.

5

(Pugliese Dep., 102).

21. Paulson is publicly active with the Lancaster County Democratic Party. (Pugliese Dep., 116).

22. From 2005 to January 2011, Paulson was either employed as a political consultant for Team Blue Politics, Inc. or worked independently as a political consultant. His work for Team Blue included managing various democratic political campaigns. (Id. at 11).

23. Since January of 2011, Paulson has been employed by the Pennsylvania House of Representatives Democratic Caucus as Chief of Staff assigned to State Representative Michael Sturla. (Paulson Dep., 9-10).

24. Paulson is and has been the Chair of the Lancaster City Democratic Committee and the Chair of the Lancaster County Democratic Committee Campaign Committee. (Id. 15).

25. Paulson describes himself as an "agitator" who is trying to unseat the current Republican Administration in Lancaster County. (Id., 90).

26. In 2008, the Republican Party filed a lawsuit against Paulson which was the same year that Martin became one of the County's three Commissioners. (Id., 91).

27. After her marriage to Paulson, plaintiff was never told by Cowhey to change her party affiliation. (Pugliese Dep., 108).

28. After her marriage to Paulson, plaintiff was never suspended or terminated by Cowhey because of her marriage. (Id.).

29. Plaintiff testified that prior to 2010, no one from Lancaster County informed Cowhey that plaintiff was a target of Martin because of her relationship with Paulson. (Pugliese Dep., 112).

6

30. In January of 2010, Martin became Chair of the Board of Commissioners.

31. Commissioner Martin is also the liaison between the Planning Department and the Board of Commissioners.

32. In February of 2010, plaintiff encountered Frank Christoffel ("Christoffel") in the stairwell after both had attended one of the public county commissioner meetings. (Id.,115). At the time, Christoffel was the government relations liaison from the Lancaster Association of Realtors. (Id.).

33. Pugliese testified that "out of the blue, [Christoffel] said, oh, you are married to that Greg Paulson, that Democrat, aren't you?" (Id.).

34. Pugliese testified that she "knew Mr. Christoffel met regularly with Mr. Martin, before or after the public commissioner meetings in his role as the liaison. So I didn't think anything of it at the time until Mr. Cowhey mentioned the same kind of issue after this Affordable Care Act e-mail." (Id., 116).

35. Plaintiff testified that in March of 2010, she received an e-mail from Paulson concerning the "summary synopsis of the impact locally of the Affordable Care Act in terms of its economic effect." (Id.,117). Plaintiff testified that after receiving permission from Cowhey, she forwarded the e-mail along with an attachment entitled, "March 2010 The Benefits of Health Care Reform in the 16th Congressional District of Pennsylvania, Committee on Energy and Commerce" on March 19, 2010 to the planning department staff. (Id. at 130; Cowhey Dep., 20-25; ECF 46-40).

36. Plaintiff further testified that later that day, she was summoned to Cowhey's office where she was informed by Cowhey that Martin was very upset about the e-mail being circulated

7

to the planning department staff. (Pugliese Dep., 130). Plaintiff testified that Cowhey told plaintiff that she may be "targeted" because of her relationship and affiliation with Paulson. (Id., 131, 133).

37. Cowhey testified that on five occasions, plaintiff told Cowhey that she felt that she was being targeted because of her association with Paulson. On each occasion, Cowhey responded that he "didn't see any evidence of that." (Cowhey Dep., 317). Democrat Cowhey testified that when plaintiff told him she was thinking of hiring a lawyer, he blurted out that he thought of hiring a lawyer himself. (Id.). Cowhey testified that it was plaintiff, not Cowhey, who always brought up the fear that she was being targeted. (Id., 318).

38. Royer and Behlau testified that they had never heard any negative comments in the workplace about plaintiff being married to Paulson. (Royer Dep., 89; Behlau Dep., 110).

39. Commissioner Stuckey testified that he had never had any discussions with Martin about Paulson and that he did not know that plaintiff was married to Paulson until plaintiff brought this action. (Stuckey Dep., 40).

40. Tom Baldridge ("Baldridge"), the President and CEO of the Lancaster Chamber of Commerce and a member of the Executive Committee for the Economic Development Plan, testified that plaintiff was viewed as a "liberal" with a "liberal" influence on the Economic Development Plan. (Baldridge Dep., 16, 17).

41. The Urban Enhancement Fund was a policy program that was started by the previous Board of Commissioners to solicit applications and provide grants to redevelop urban areas within the County.

42. The Urban Enhancement Fund was a "program started by the previous board for

8

fundamentally either the city or the boroughs as a balance to the money spent on agricultural

preserve." (Stuckey Dep., 62).

43. In December 2010, the Board of Commissioners made the decision to no longer fund

the Urban Enhancement Program. (McCue Dep., at 75-80).

44. The Urban Enhancement Fund was supported by Commissioners Stuckey and

Lehman, but not by Commissioner Martin.

45. When asked why the Urban Enhancement Fund was discontinued, Commissioner

Lehman testified that:

> In 2010 at our budget work session there was discussion by the Board of
> Commissioners that given where the county was from its debt position that we
> may not be able to fund all programs on an annual basis, and the discussion was,
> well, we could do urban enhancement one year, natural lands the next year, urban
> enhancement the following year going on an every other year cycle, and that might
> be a way to continue to fund both those programs and perhaps even the formal
> municipal transportation program.

(Lehman Dep., 97-98).

46. In 2012, the year following plaintiff's elimination, the Commissioners voted 2-1 to

fund the Urban Enhancement and Farmland Preservation. Commissioner Martin voted against.

47. The Economic Development Plan was a component of the County Comprehensive

Plan.

> The Introduction to the Economic Development Plan stated:

> This is not a plan for municipal consolidation nor is it a plan to usurp the role of
> the private sector as the fundamental engine of economic development. The
> Lancaster County Economic Development and Sustainability Plan is about the
> importance of acting as a region to develop and sustain our regional (countywide)

9

economy. It is about the role of the public sector in providing efficient, effective
and quality public services (education, libraries, water, sewer, and transportation
infrastructure, public safety, land use planning) that are essential to a healthy
growing and sustainable free market economy.
It is also about the importance of ongoing communication and cooperation across
municipal, organizational and public and private sector boundaries in order to ensure a
strong economic future for our community.

(ECF 46-40).

48. Plaintiff testified that she was the project manager for the Economic Development

Plan and a member of the Plan's Executive Committee. (Pugliese Dep., 167). She further

testified that the development of the Economic Development Plan "was based on extensive

citizen participation process so that the citizens themselves drove this plan (Id., 168), and that

"the policy recommendations or even the data collected" for the Economic Development Plan

were the result of an "extensive citizen group consensus process." (Id., 172).

49. Scott Sheely ("Sheely"), the Executive Director of Lancaster County Workforce

Investment Board and member of the Executive Committee for the Economic Development Plan

testified that the task of developing an economic development plan for Lancaster County "should

be done." (Sheely Dep., 91). However, Sheely testified that he had "difficulty believing [the

Economic Plan ]would work in Lancaster." (Sheely Dep., 103).

50. Some in the Lancaster Community were wary of the Economic Development Plan

because "local control is very important in Lancaster County" and some citizens believed that

"local control is being challenged by this plan" and that "this regional group was going to

somehow negatively impact local control." (Lehman Dep., 54).

51. In handwritten notes on a November 19, 2010 Breakfast Meeting Agenda, Cowhey

10

wrote, inter alia, "Functional Analysis of Divisions Housing and Economic Development Planning and Research." (ECF 46-53).

52. At a meeting on December 7, 2010 with Commissioners Martin and Stuckey, Cowhey recommended that work on the Economic Development Plan be suspended. (Cowhey Dep., 84, 85).

53. Cowhey explained his reasoning for recommending that the Plan be suspended as follows: "I just recall that we had gone several reiterations of the plan. The Commissioners were not satisfied with the policy direction of the plan. They had concerns about it. We had attempted to make changes to the plan to meet those comments. And I felt that by that time we had exhausted what we could do with that plan. So I recommended that, rather than continuing to put staff resources towards spinning our wheels, in essence, I recommended that we just not have staff work on it any longer." (Cowhey Dep., 85; ECF 49-1, ¶¶ 2-4).

54. The sole Democratic Commissioner, Lehman, was not present at the December 7, 2010 meeting. (Id. at 86, 252). Cowhey testified that Commissioner Lehman also had concerns about the Economic Development Plan. (Id.).

55. Commissioner Lehman testified that Commissioners Martin and Stuckey did not ask him for his agreement to suspend the Economic Development Plan prior to the December 7, 2010 meeting. (Lehman Dep. at 43). Lehman testified that it was his preference to continue work on the Plan. (Id.).

56. Prior to the December 7, 2010 meeting, Cowhey did not inform plaintiff of his recommendation. (Id. at 253). On November 29, 2010, Cowhey uninvited plaintiff from the December 7, 2010 meeting.

11

57. Commissioners Martin and Stuckey accepted Cowhey's recommendation to stop work on the Economic Development Plan. (Id.)

58. There was no public notice of the December 7, 2010 meeting. There was no public hearing at the December 7, 2010 meeting. (Id., 252).

59. Baldridge testified that he was "disappointed" by the Commissioners' decision to stop work on the Economic Development Plan because he believed "there was value in the economic plan." (Baldridge Dep., 96).

60. Plaintiff testified that 60% of the Housing and Economic Development Division's duties were devoted to developing, administering and coordinating the Economic Development Plan. (Pugliese Dep., 93).

61. Plaintiff testified that 10% to 20% of the Housing and Economic Development Division's duties were devoted to administering the Urban Enhancement Fund. (Id., 94).

62. Plaintiff testified that she did not believe the Board of Commissioners did not adopt the Economic Development Plan because of her marriage to Paulson or because she was a female. (Pugliese Dep., 428).

63. Sheely testified that no executive committee member had told him that the Board of Commissioners were suspending work on the Economic Development Plan because of plaintiff's gender or in retaliation for being married to Paulson. (Sheely Dep., 47-48).

64. Because Cowhey began to believe during the latter part of 2010 that an Economic Development Plan might not be adopted by the Board of Commisioners, Cowhey began a staffing analysis in approximately November 2010.  Cowhey requested each of his four division directors to reflect on the work of their divisions by evaluating (a) the mission of their division;

12

(b) 2011 division priorities; (c) how priorities reflect the mission; (d) a 2-year work outlook; (e) whether there is a sufficiency or lack of resources; and (f) how they as leaders know what their staff is working on. ( ECF 41-20).

65. Each of the four division directors submitted such an evaluation. (Id.).

66. Plaintiff, as the division director for Housing and Economic Development Planning, noted in her evaluation that two of the division's seven priorities were implementing the Economic Development and Sustainability Plan and administering the Urban Enhancement Fund. (Id.). Another priority was promoting the availability of affordable housing. (Id.).  Plaintiff also recognized in her evaluation that these "[p]riorities could change, depending upon whether or not the [Urban Enhancement Fund] Program is reauthorized and whether or not the Draft Economic Development and Sustainability Plan is adopted as an element of the County Comprehensive Plan." (Id.).

67. In January 2011, plaintiff was asked by Cowhey to conduct a second staffing analysis this time limited to the Urban and Borough Circuit Rider Program. Plaintiff was the only division director whom Cowhey asked to a complete a second analysis.

68. Plaintiff responded by offering to reorganize her Division to account for the gap left by the early retirement of the Urban Policy Specialist in the Community Planning Division. (ECF 46-6, ¶ 23).

69. Cowhey rejected plaintiff's proposal within 17 minutes of receiving it, stating that plaintiff's proposal "was not what he had in mind for the division. Period." (ECF 46-52). Cowhey also stated that he was not going to consider restructuring any of the other divisions. (Id.).

70. On January 21, 2011, plaintiff submitted another proposal to Cowhey for restructuring

her division. In her proposal, plaintiff acknowledged that "[t]he demise of the Economic

Development and Sustainability Plan and process, the indefinite suspension of the Urban

Enhancement Program, and the impact that recent economic trends have had on the availability

of state funds to assist urban communities with economic and community development

initiatives has profoundly affected the work and workload of my division and will essentially idle

four of the six individuals in my division (including myself)." ( ECF 41-21).

71. In late July and early August 2011, Cowhey completed the "Lancaster County

Planning Commission Workforce Plan 2011-2012." (ECF 41-22).

72. In that Plan, Cowhey proposed the elimination of the Housing and Economic

Planning Division because

> the changing nature of department programs has obviated the need for a separate
> economic development division. The department is not involved in direct project
> delivery as it once was because other agencies are responsible for that function in
> Lancaster County. With the defunding of the Urban Enhancement Grant program
> a position primarily devoted to administration of that program can be eliminated
> (short-term remaining administration of outstanding grants will be handled by the
> administrative division). Therefore, the director's position can be eliminated along
> with the administrative secretary's position that support it and the senior planner
> position assigned to UEF. Housing, grant administration, and community
> development functions/personnel will be assigned to their divisions. The housing
> planner will be promoted to senior planner in recognition of acceptance of more,
> higher level duties and assigned to another division. The research specialist will
> be assigned to Long Range and Heritage and the senior borough circuit rider
> assigned to Community Planning.

(ECF 41-22, p.8); (Cowhey Dep., 314).

73. As a result, Cowhey decided that re-organizing the Planning Department into "three

functional divisions instead of four, reassignment of staff, several position eliminations, and

14

filling vacancies the department will enhance service delivery (and reduce budget expenditures

for salary and benefits)." (ECF 41-22, p.2); (Cowhey Dep., 80).

74. Cowhey testified that

The Commissioners had decided not to fund the urban enhancement grant
program any longer. The economic development plan, which had been worked on
by that division was indefinitely put on hold or suspended. There was no work
that the department was doing any longer.

(Cowhey Dep., 83).

75. Cowhey averred that "[i]f an economic development plan had been adopted, it is very

likely that the Plaintiff's Division would have remained a part of the Department [of Planning] in

order to implement that Plan." (ECF 49-1, ¶ 18).

76. The 2012 salary benefits budget expenditures for the Planning Department were

increased by approximately $300,000 from the 2011 department budget.

77. In October of 2011, Cowhey made his recommendation to the Board of

Commissioners to eliminate plaintiff's position. (Cowhey Dep., 80-81).

78. On December 5, 2011, the Lancaster County Salary Board adopted Cowhey's

recommendation and eliminated plaintiff's position effective December 19, 2011. (ECF 41-23);

(Cowhey Dep., 78-80).

79. The Planning Department was then realigned, pursuant to the Lancaster County

Planning Commission Workforce Plan of 2011-2012, into three fundamental divisions-

Countywide Planning (formerly Long Range and Heritage Planning), Community Planning and

Transportation Planning.

80. In addition to plaintiff, four other positions in the Housing and Economic

15

Development Planning were eliminated, including a Senior Planner; an accountant; an engineer and an administrative secretary. (ECF 41-23).

81. The housing planning work from the Housing and Economic Development Division was transferred to the Countywide Planning Division. (ECF 49-1, ¶ 26).

82. In an e-mail to Commissioners Martin, Stuckey and Lehman dated July 16, 2012, Cowhey stated that former members of the Executive Committee for the Econominc Development Plan, Ray D'Agostino and Sheely, were working on and editing in a private capacity, "a document that provides data, information and some guidance for a community-wide response to economic development issues. The paper will be finished late summer and the group will, I believe, want to meet with you to discuss their work and let you know what their next steps will be." (ECF 46-34; 49-1, ¶¶ 6-7). A document entitled "Framework Economic Growth in Lancaster County" was prepared in June 2012 and August 2012. (ECF 46-47, 46-48).

83. Plaintiff testified that she has no evidence that any of the Commissioners, and specifically Martin, directed Cowhey either orally or in writing, to eliminate her Division. (Pugliese Dep., 510-511).

84. Plaintiff separated on December 16, 2011, after her Division was eliminated pursuant to a restructuring of the Department of Planning. (Pugliese Dep., 470; Cowhey Dep., 119).

85. Plaintiff avers that Cowhey admitted to her that the proposed elimination of her Division and directorship was suspect gender discrimination. Cowhey denies making this statement. (ECF 49-1, ¶ 39).

86. Cowhey testified that plaintiff's division, the Housing and Economic Development Planning division was the only division eliminated and that plaintiff was the only division

16

director considered for elimination. (Cowhey Dep., 105).

87. Andrea McCue, the County Administrator who at the time of plaintiff's separation was the interim supervisor of the Human Resources Director, testified that Cowhey did not tell her he was concerned about gender or sex discrimination as a result of the elimination of plaintiff's position. (McCue Dep., 24).

88. McCue testified that plaintiff never complained to Human Resources that she was the only female manager whose position was eliminated. (Id., 36).

89. Plaintiff avers that she informed McCue that her termination amounted to gender discrimination. (ECF 46-6, ¶ 36).

90. Cowhey averred that the elimination of the Parks Initiative Grants in 2003 and the Municipal Transportation Grants in 2010 did not result in the elimination of the Countywide Planning or the Transportation Planning Divisions respectively. (ECF 49-1, ¶ 41). According to Cowhey, these two grant programs made up a significantly smaller proportion of work of those Divisions than did the Economic Development Plan and Urban Enhancement Fund of plaintiff's Division. (Id.).

91. Prior to her separation with the County on December 16, 2011, plaintiff was offered a senior planner position in Behlau's Community Planning Division. (Pugliese Dep., 470). Plaintiff refused the position because it represented a "significant demotion" in terms of salary and position. (Id., 472).

92. Plaintiff testified that she believed the offer was inappropriate because "it dealt with one specialized area of planning, ordinance administration versus comprehensive planning development, which was the other major area in the planning department of which I was expert

17

and focused." (Pugliese Dep.,473).

93. Plaintiff testified that she also informed Cowhey that "my area was primarily focused on urban areas, areas within the urban growth boundaries versus rural and ag lands." (Id., 473-474).

94. In an e-mail to Cowhey dated December 8, 2011, plaintiff stated that she is an "urban planner exclusively, with a particular focus, in terms of education and experience, on the social and economic aspects of urban development and redevelopment. . . I also have a strong background in demographic and socio-economic research as related to analyzing community trends." (ECF 41-24).

95. At all times during her employment with the County, plaintiff received positive performance reviews.

96. The Transportation Planning Division requires that a candidate for Director have at a minimum "[e]xtensive experience in transportation planning or related field within a department or public sector planning organization with direct responsibility for implementing planning policy decisions must be evident." (ECF 41-25).

97. Royer, the Transportation Planning Division Director, has been with the Planning Department since 2000 and has been Director since 2006 (Royer Dep., 43).

98. Plaintiff testified that she had not conducted any formal transportation planning. (Pugliese Dep., 33).

99. Plaintiff testified that she believed she had more transportation planning experience than Royer because of her "extensive experience as the executive director of the Inner City Group in developing, raising funds for and implementing a major transportation corridor

18

improvement for that organization." (Pugliese Dep., 239).

100. Cowhey averred that while plaintiff's plan for the Inner City Croup was a "very good program," it "included less than a mile of street improvements and one or two traffic lights." (ECF 49-1, ¶ 34). Cowhey averred that Royer coordinates with "PennDot the planning and programming of the required Transportation Improvement Program currently valued at over \$256,000,000 over the four years covered by the Plan." (Id.).

101. The Community Planning Division requires that the Director have "extensive experience in community, environmental and economic development planning" and administering the Lancaster County Subdivision and Land Development Ordinance. (ECF 41-26). The Director is responsible for "developing and maintaining liaison with municipal governments, delivery of planning assistance to local governments, project management for county funded multi-municipal comprehensive plans, consultation with local governments on implementation of growth management strategies and the Lancaster County Comprehensive Plan and administration of the Lancaster County Subdivision and Land Development Ordinance." (Id.).

102. Plaintiff testified that she had never performed any type of formal planning work with respect to land use and land development. (Pugliese Dep., 34).

103. Behlau, the Community Planning Division Director, has been Director since 2005, and his tenure precedes that of plaintiff. (Behlau Dep., 61). Behlau has experience in community planning and public sector planning, including long-range planning, specific planning, section section supervisor, zoning code amendments, special projects and public presentations. (Id., 55, 58).

19

104. In a 2011 Performance Evaluation Report dated December 5, 2011, Cowhey rated Behlau's overall performance as very good, although the evaluation noted that Behlau's weakest factor was his ability to get along with others. (ECF 46-21).

105. In 2009 plaintiff complained to Cowhey that Behlau "did not respect women." (ECF 46-10).

106. Cowhey directed Behlau to "attend training on communication and insensitivity to interpersonal matters." (Id.).

107. At one point, Behlau berated a female office manager to the point that she was reduced to tears. Behlau was admonished by Cowhey for his outburst.

108. On November 17, 2009, Behlau completed a course in "Dealing with Difficult People." (ECF 46-19; 46-10).

109. In December of 2009, Behlau presented Cowhey with a list containing the names of people "Who I've had conflict with," "Who I don't like," and "Who I like and can work with." Plaintiff's name appeared in the "Who I've had conflict with" (since 2007) and "Who I don't like" categories. (ECF 46-20). The same list was reissued to Cowhey on December 4, 2011. Cowhey did not take the list to Human Resources. (Cowhey Dep., 254, 258).

110. In a 2012 Performance Evaluation Report dated May 29, 2012, Cowhey rated Behlau's overall performance as good, although the evaluation noted that Behlau's weakest factor was dependability. (ECF 46-33). In this regard, Cowhey noted that Behlau displayed "a level of disengagement from administrative and managerial duties during the rating period and less than satisfactory interaction with me and other managers." (Id.).

111. The job summary for the Countywide Planning Division Director states that the

20

Director is the "principal administrator of all matters pertaining to strategic and long-term planning for the County and for planning in functional disciplines on a countywide basis. The Director for Countywide Planning is primarily responsible for the development and periodic revision of the Lancaster County Comprehensive Plan, which focuses on land use and community growth and incorporates elements regarding parks and open space, public facilities and traffic circulation and transportation, community development, housing, urban design, water resources, historic preservation, community indicators, and smart growth." (ECF 41-27).

112. Standish, the Countywide Planning Division Director, is a professional tourism expert and comprehensive planning expert with over 30 years experience, and he has been Division Director since approximately 1989, with various roles in the Department since 1982. (Standish Dep. at 36). In addition, Standish developed all aspects of the County's comprehensive plan and initiated the heritage tourism program for the County of Lancaster. (Id., 35, 36).

113. Standish, however, does not have a Master's degree despite the minimum requirement that all division directors have a a Master's degree. (Standish Dep., 34). According to Cowhey, a Master's Degree "is not an absolute necessity when years of experience and solid expertise can be substituted for the advanced degree." (ECF 49-1, ¶ 28).

114. Plaintiff testified that she did not have any experience conducting formal historic preservation or historic planning. (Pugliese Dep., 34).

115. The number of employees for Lancaster County has steadily declined since approximately 2008.

116. A total of 100 full time and 31 part time positions were eliminated by the County between 2008 and the end of 2011 while only 64 full time and 15 part time positions were added.

21

(ECF 41-19).

117. McCue testified that she was not aware of a reduction in force in all departments in the County in December 2011. (McCue Dep., 43-45).

## DISCUSSION

In Count One of her Complaint brought against all remaining defendants, plaintiff first claims her position was eliminated in retaliation for engaging in protected free speech.

"To establish a First Amendment retaliation claim, a public employee must show that his speech is protected by the First Amendment and that the speech was a substantial or motivating factor in what is alleged to be the employer's retaliatory action." Flora v. County of Luzerne, 776 F.3d 169, 174 (3d Cir. 2015).

A public employee's statement is protected by the First Amendment when: "(1) in making it, the employee spoke as a citizen, (2) the statement involved a matter of public concern, and (3) the government employer did not have an 'adequate justification for treating the employee differently from any other member of the general public' as a result of the statement he made." Hill v. Borough of Kutztown, 455 F.3d 225, 241-42 (3d Cir. 2006), (quoting Garcetti v. Ceballos, 547 U.S. 410, 418 (2006)).

In evaluating whether a public employee's statement was made as a citizen, the key question is "whether the speech at issue is ordinarily within the scope of an employee's duties." Lane v. Franks, 134 S.Ct. 2369, 2379 (2014).

Plaintiff does not identify a single written or oral statement or action in the record that she claims was protected speech. Instead, she relies solely on the following two general averments in her affidavit: 1) "At all times I spoke out as a citizen for the people of Lancaster County and

22

public at large. I was an advocate for inner-city revitalization, affordable housing, and urban planning and economic development." and 2) "I was retaliated against for speaking out as a citizen. I advocated for the citizen's rights to affordable housing, affordable healthcare and equal educational and employment opportunities." (ECF 46-6, ¶¶ 8, 32).

Ironically, among plaintiff's specifically enumerated essential functions as Director for Economic Development Planning are attending a wide variety of public and other meetings, advising public and private sectors in developing new planning concepts, plans, projects or programs, and preparing and delivering speeches, articles, reports and other presentations dealing with economic development planning. (ECF 41-16).

In addition, plaintiff herself testified that she was the project manager for the Economic Development Plan. (Pugliese Dep., 167). She further testified that the development of the Economic Development Plan "was based on extensive citizen participation process so that the citizens themselves drove this plan (Id.,168), and that "the policy recommendations or even the data collected" for the Economic Development Plan were the result of an "extensive citizen group consensus process." (Id.,172).

Thus, any general statements plaintiff made as an advocate for inner-city revitalization, affordable housing, urban planning, economic development, affordable healthcare and equal educational and employment opportunities were clearly made in connection with the essential functions of her public position as Director of Economic Development Planning and not as a private citizen.

Even if plaintiff could somehow establish that she spoke as a citizen, rather than as a public employee and assuming, *arguendo*, that she satisfied the remaining two elements for First

23

Amendment protection of a public employee's statement, there is absolutely no evidence in the record that shows that any statement made or written by plaintiff was a substantial or motivating factor in the decision to eliminate plaintiff's position. The mere fact that an individual who is not a member of the Board of Commissioner nor a member of the Planning Department (Baldridge) testified that plaintiff was viewed as a "liberal" does not establish causation. Accordingly, judgment will be entered in favor of the defendants on plaintiff's First Amendment retaliation claim based on protected free speech.

Plaintiff also claims in Count One that her position was eliminated in retaliation "against her marriage to an active Democrat and association as a Democrat." (ECF 46-6, ¶ 44).

In order to establish a prima facie case of discrimination based on political association in violation of the First Amendment, plaintiff must establish that "(1) she was employed at a public agency in a position that does not require political affiliation, (2) she was engaged in constitutionally protected conduct, and (3) this conduct was a substantial or motivating factor in the government's employment decision. Galli v. New Jersey Meadowlands Comm'n, 490 F.3d 265, 271 (3d Cir. 2007). If plaintiff can make such a showing, the defendants may "avoid a finding of liability by proving by a preponderance of the evidence that the same employment action would have been taken even in the absence of the protected activity." Id.

Defendants essentially concede the first two elements for a prima facie case, but contend that plaintiff has failed to present evidence from which a jury could establish that her marriage to an active Democrat was a substantial or motivating factor in the decision to eliminate her position. The Court agrees.

Plaintiff married Paulson, an active Democrat, on December 27, 2008. Defendant

24

Cowhey, who was plaintiff's supervisor, and Division Director Standish attended plaintiff's wedding. After her marriage to Paulson, plaintiff was never told by Cowhey to change her party affiliation. (Pugliese Dep. at 108). Nor was she ever suspended or terminated by Cowhey because of her marriage. (Id.). Indeed, plaintiff testified that, prior to 2010, no one from Lancaster County had ever informed Cowhey that plaintiff was a target because of her marriage to Paulson. (Id., 112).

Rather, plaintiff testified that her marriage to Paulson became an issue in February of 2010, just after Martin had become Chair of the Board of Commissioners. However, the only evidence in the record that she relies on is her own testimony of a chance encounter with Christoffel in a stairwell when Christoffel told plaintiff "out of the blue . . . oh, you are married to that Greg Paulson, that Democrat, aren't you." (Id., 115) and that Cowhey told her in March of 2010, following the e-mail incident about the Affordable Care Act, that she "may be a target because of [her] marriage to Gregory Paulson." (Id., 131) (emphasis added). Such speculative evidence simply does not create a genuine issue of material fact and is not indicative that plaintiff's political association was a substantial or motivating factor in the decision to eliminate her division and position.[1] Nor does Baldridge's testimony that plaintiff was viewed as a "liberal" with a "liberal influence on the Economic Development Plan" establish the necessary causal connection. In fact, plaintiff herself testified that she did not believe the Board of

---

[1] Cowhey testified that he did not tell plaintiff she was being "targeted" and that it was plaintiff who came to him maybe as much as five times with the idea that she was targeted because of her affiliation with Greg Paulson. (Cowhey Dep. at 317, 318). The Court does not consider the discrepancy to raise a disputed issue of material fact since even if a jury were to credit plaintiff's testimony, the use of the phrase "may be targeted," without more, could not allow a reasonable jury to conclude that plaintiff's political association was a substantial or motivating factor in the elimination of her entire Division and position. Galli, 490 F.3d at 271.

25

Commissioners did not adopt the Economic Development Plan in 2011 because of her marriage to Paulson. (Id., 428). Indeed, the evidence reveals that the Urban Enhancement Fund was defunded, not in any way due to plaintiff's political association, but pursuant to a policy decision by all three Commissioners, including a Democrat, and the Economic Development Plan was suspended and the Planning Department was ultimately restructured, not in any way because of plaintiff's political association, but pursuant to Democrat Cowhey's systematic analysis in the 2011-2012 Workforce Plan.

The Court also notes that the encounter with Christoffel and the e-mail incident occurred in February and March of 2010 respectively, some 20 months before plaintiff's position was eliminated. Therefore, there clearly was no temporal proximity to these events and the decision to eliminate plaintiff's position.

In addition, Royer and Behlau testified that they had never heard any negative comments in the workplace about plaintiff being married to Paulson, (Royer Dep., 89; Behlau Dep., 110), and that Commissioner Stuckey testified that he had never had any discussions with Martin about Paulson and that he did not know that plaintiff was married to Paulson until plaintiff brought this action. (Stuckey Dep., 40). Because the Court finds that there is no evidence in the record from which a reasonable jury could conclude that plaintiff's political association was a substantial or motivating factor in the decision to eliminate plaintiff's position, plaintiff has not established a prima facie case of discrimination based on political association in violation of the First Amendment. Accordingly, judgment will be entered in favor of defendants on this claim.

Plaintiff also claims in Count One that the elimination of her position by the defendants violated the Equal Protection Clause of the Fourteenth Amendment because only her division

26

was eliminated whereas Royer, Behlau and Standish remained as heads of their respective divisions.

In order to establish a claim under the "class of one" theory plaintiff must show "'that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'" Marcavage v. Nat'l Park Service, 666 F.3d 856, 860 (3d Cir. 2012)(quoting Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000)). Specifically, plaintiff must establish that she was 1) "intentionally treated differently from others similarly situated," and 2) "there is no rational basis for the difference in treatment." Id.

With regard to the first element, persons are similarly situated for purposes of the Equal Protection Clause when they are alike "'in all relevant aspects.'" Startzell v. City of Phila, 533 F.3d 183, 203 (3d Cir. 2008) (quoting Nordlinger v. Hahn, 505 U.S. 1, 10 (1992)).

Plaintiff was not similarly situated to the other three division directors who were retained. No other division was impacted to the extent plaintiff's division was by the suspension of the Economic Development Plan and defunding of the Urban Enhancement Fund. According to plaintiff's own testimony, the Economic Development Plan and Urban Enhancement Fund accounted for nearly 80% of the work of the Housing and Economic Development Planning Division. (Pugliese Dep., 93, 94). Plaintiff admitted that once those two projects were defunded, there was a lack of work for her division to perform. (ECF 41-21). By contrast, there is no evidence that the remaining three Divisions experienced a reduction of work at all, let alone to the extent that plaintiff's division was affected. Therefore, plaintiff was not similarly situated to Royer, Behlau and Standish.

Even if plaintiff could establish that she was similarly situated to the other three directors,

27

she has failed to produce evidence that there was no rational basis for the difference in treatment. The difference in treatment must be "'irrational and wholly arbitrary.'" Eichenlaub v. Twp. of Indiana, 385 F.3d 274, 286 (3d Cir, 2004) (quoting Vill. of Willowbrook, 528 U.S. at 564). These challenges fail when "there is any reasonably conceivable state of facts that could provide a rational basis for the classification." Heller v. Doe, 509 U.S. 312, 320 (1993).

As will be discussed in more detail, *infra*, plaintiff has failed to present evidence that the decision to eliminate her position and division was irrational and wholly arbitrary. On the contrary, the evidence reveals that the decision to eliminate her position was based on a reasoned decision by the Commissioners, in light of the economic and social climate which existed at the time, to defund the Economic Development Plan and the Urban Enhancement Fund. Plaintiff later admitted that combined the Economic Development Plan and Urban Enhancement Fund accounted for nearly 80% of her division's work, (Pugliese Dep., 93. 94) and, as a result, four of her six staff members, including herself, were going to become idled. (ECF 41-21). As a result, Cowhey, after first conducting a staff analysis, recommended to the Commissioners that plaintiff's division be eliminated. (Cowhey Dep., 80, 83). In addition, as will be discussed, *infra*, plaintiff lacked the necessary experience and qualifications to justify displacing any of the other three directors. Judgment will be entered in favor of the defendants on plaintiff's Equal Protection claim.[2]

Plaintiff's final claim in Count One is a conspiracy claim brought pursuant to 42 U.S.C. § 1983 against defendants Cowhey and Martin."To demonstrate a conspiracy under § 1983, a

---

[2] Plaintiff has decided not to proceed with her due process claims under the Fourteenth Amendment. (ECF 46, p. 18).

plaintiff must show that two or more conspirators reached an agreement to deprive him or her of a constitutional right under 'color of state law.'" Parkway Garage Inc. v. City of Philadelphia, 5 F.3d 685, 700 (3d Cir. 1993) citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 150 (1970).

The record is devoid of any evidence of any agreement between Cowhey and Martin to deprive plaintiff of any constitutional right. Plaintiff herself testified that she has no evidence that any of the Commissioners, specifically Martin, directed Cowhey, either orally or in writing, to eliminate her Division. (Pugliese Dep., 510-511). On the contrary, the evidence reveals that Cowhey recommended to the Board of Commissioners to eliminate plaintiff's division only after undertaking a through staffing analysis beginning in November 2010 and concluding that with the suspension of the Economic Development Plan and defunding of the Urban Enhancement Fund, "[t]here was no work that the department was doing any longer." (Cowhey Dep., 83). Plaintiff herself testified that 60% of her Divisions' duties were devoted to developing, administering and coordinating the Economic and Development Plan and that 10-20% of her Division's duties were devoted to administering the Urban Enhancement Fund. (Pugliese Dep., 93, 94). Plaintiff also recognized in her evaluation that these "[p]riorities could change, depending upon whether or not the [Urban Endowment Fund] Program is reauthorized and whether or not the Draft Economic Development and Sustainability Plan is adopted as an element of the County Comprehensive Plan." (Id.).

In Count Two of her Complaint brought against the defendant County of Lancaster, plaintiff contends that her position was eliminated solely because of her gender in violation of Title VII of the Civil Rights Act of 1964 and the PHRA.

A plaintiff asserting a Title VII claim may proceed by using the three-step burden-shifting

29

framework set forth by the Supreme Court in McDonnell Douglas v. Green, 411 U.S. 792

(1973).[3] Under that approach, plaintiff must first establish a prima facie case of discrimination.

(411 U.S. at 802). If a plaintiff successfully establishes a prima facie case, the burden shifts to the

defendant to articulate some legitimate, non-discriminatory reason for its decision. (Id.). If the

defendant succeeds, the burden returns to the plaintiff to show that the employer's stated reason

for termination was merely a pretext for intentional discrimination. (Id. at 804).

To establish a prima facie case of gender discrimination in a reduction-in-force

circumstance, plaintiff must show that "(1) she belonged to a protected class, (2) she was

qualified for the position from which she was terminated, (3) she was terminated and (4) persons

outside of the protected class were retained." In re Carnegie Center Associates, 129 F.3d 290,

294-95 (3d Cir. 1997).

As a female, plaintiff is a member of a protected class. There is no dispute that plaintiff

was qualified for the position of Director of the Housing and Economic Development Division

before the position was eliminated. Plaintiff's position was eliminated while the three male

division directors were retained.  Under these circumstances, the Court finds that plaintiff has

established a prima facie case of gender discrimination.

The burden now shifts to defendants to show a legitimate, nondiscriminatory reason for

plaintiff's adverse employment action. Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d

1061, 1070, 1079 (3d Cir. 1996). The Court finds that defendants have satisfied their "relatively

---

[3]Discrimination claims under the PHRA are subject to the same standards as Title VII for
purposes of summary judgment. Jones v. Sch. Dist. of Phila., 198 F. 3d 403, 409 (3d Cir. 1991).

30

light burden"[4] by introducing evidence that plaintiff's division and position was eliminated as part of a reorganization because of lack of work.

Now, the burden shifts back to plaintiff to show that defendants' legitimate reasons are pretextual. A plaintiff can show pretext in one of two ways: "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. Fuentes, 32 F.3d at 764. "To discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent or competent." Id. at 765. Under the law of this Circuit, it is incumbent upon plaintiff to point to evidence which demonstrates "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." Id.

Plaintiff has failed to offer evidence from which a reasonable factfinder could either disbelieve defendants' articulated reasons or believe that a discriminatory motive was more likely than not a determinative factor in the decision to eliminate plaintiff's position. On the contrary, the evidence clearly establishes that plaintiff's position was eliminated due to a shortage of work.

In November 2010, Cowhey began a staffing analysis, requesting each of his four division directors to submit an evaluation of his/her Division. (ECF 41-15). There is no evidence that the

---

[4] Fuentes v. Perskie, 32 F. 3d 759, 763 (3d Cir. 1994).

31

staffing analysis was undertaken for an invidious reason and indeed the job description for the Director of Housing and Economic Development Planning specifically stated that the Director "performs work subject to the periodic evaluation of approved goals and performance by the Executive Director." (ECF 41-16).

Plaintiff submitted her evaluation of the Housing and Economic Development Planning's Division by noting, inter alia, that two of the Division's seven priorities were implementing the Economic Development and Sustainability Plan and administering the Urban Enhancement Fund. (ECF 41-15). In fact, plaintiff herself testified that as much as 60% of the Housing and Economic Development Division's duties were devoted to developing, administering and coordinating the Economic Development Plan. (Pugliese Dep., 93). Plaintiff also testified that 10% to 20% of the Housing and Economic Development Division's duties were devoted to administering the Urban Enhancement Fund. (Id., 94). Although plaintiff repeatedly argues that plaintiff's Division still had housing as one of its priorities, housing, by plaintiff's own estimation, could not have accounted for more than 20% to 30% of the Division's remaining workload.

Plaintiff also specifically recognized in her evaluation that the reauthorization of the Urban Enhancement Fund and adoption of the Economic Development Plan in 2012 were no sure thing since "[p]riorities could change, depending upon whether or not the UEF Program is reauthorized and whether or not the Draft Economic Development and Sustainability Plan is adopted as an element of the County Comprehensive Plan." (Id.). Thus, the fact that the Economic Development Plan was suspended and the Urban Enhancement Fund was defunded should not have come as a surprise to plaintiff.

32

At a meeting on December 7, 2010 with Commissioners Martin and Stuckey, Cowhey

recommended that work on the Economic Development Plan be suspended. (Cowhey Dep., 84,

85). Cowhey testified that the reason for his recommendation was that "I just recall that we had

gone several reiterations of the plan. The Commissioners were not satisfied with the policy

direction of the plan. They had concerns about it. We had attempted to make changes to the plan

to meet those comments. And I felt that by that time we had exhausted what we could do with

that plan. So I recommended that, rather than continuing to put staff resources towards spinning

our wheels, in essence, I recommended that we just not have staff work on it any longer."

(Cowhey Dep., 85).

Commissioner Stuckey confirmed that it was Cowhey alone who recommended that work

on the Economic Development Plan be stopped when he testified, "I voted to do the reduction in

force for the Planning Commission based on the objective analysis by the Executive Director that

that function was no longer needed." (Stuckey Dep., 46). At no time did Commissioner Stuckey

instruct Cowhey to stop working on the Economic Development Plan or instruct him to remove

plaintiff from working on the Plan. (Id., 30, 44). In addition, the December 5, 2011 Salary

Minutes confirm that it was Cowhey alone who recommended that the Economic Development

and Housing Division be eliminated, and the Salary Board then moved in favor of his

recommendation and the motion carried unanimously (ECF 41-23).

Plaintiff contends that the fact that the December 7, 2010 meeting was not open to the

public, was held without notice to the public and without the presence of the sole Democratic

Commissioner Lehman is evidence of an invidious discriminatory motive. While such a scenario

may have given rise to a claim under the Commonwealth of Pennsylvania's Sunshine Act, 65 Pa.

33

Cons. Stat. §§ 701-716, a reasonable factfinder could not conclude that such actions, by themselves, are indicative of a discriminatory motive against plaintiff.

After Commissioner Martin and Stuckey voted to follow Cowhey's recommendation to suspend the Economic Development Plan and defund the Urban Enhancement Fund, plaintiff submitted a proposal to Cowhey for restructuring her division. In her proposal, plaintiff specifically acknowledged that "[t]he demise of the Economic Development and Sustainability Plan and process, the indefinite suspension of the Urban Enhancement Program, and the impact that recent economic trends have had on the availability of state funds to assist urban communities with economic and community development initiatives has profoundly affected the work and workload of my division and will essentially idle four of the six individuals in my division (including myself)." (ECF 41-21) (emphasis added).

In late July and early August 2011, Cowhey completed the "Lancaster County Planning Commission Workforce Plan 2011-2012," in which he proposed reorganizing the Planning Department into "three functional divisions instead of four, reassignment of staff, several position eliminations, and filling vacancies the department will enhance service delivery (and reduce budget expenditures for salary and benefits)." (ECF 41-22, p.2); (Cowhey Dep., 80). Cowhey specifically testified that there was "no work that the [Housing and Economic Division] was doing any longer" since the "Commissioners had decided not to fund the urban enhancment grant program any longer" and the "Economic Development Plan was indefinitely put on hold or suspended." (Cowhey Dep., 83).

In short, the evidence overwhelmingly establishes that plaintiff's division and position were eliminated not because of her gender, but because nearly 80% of the work of her division

34

was either not being funded or put on hold and suspended. On the contrary, none of the

remaining three divisions needed to be eliminated because none of those divisions had lost nearly

80% of its work. Plaintiff herself testified that she has no evidence that any of the

Commissioners, and specifically Commissioner Martin, directed Cowhey, either orally or in

writing, to eliminate her Division. (Pugliese Dep., 510-511) .[5]

_____

[5]In her opposition to defendants' motion for summary judgment, plaintiff raises for the first time a claim for a hostile work environment. Defendants correctly point out that plaintiff never presented such a claim in her Charge with the EEOC and never alleged such a claim in her Complaint. Therefore, such a claim is not appropriately before the Court. See, Fakete v. Aetna Incorp., 152 F.Supp 2d 722, 732 (E.D. Pa. 2001). (The legal analysis for whether a judicial complaint is within the scope of an earlier administrative charge or reasonable investigation therefrom turns on whether "there is a close nexus between the facts supporting each claim or whether additional charges made in the judicial complaint may be fairly considered explanations of the original charge or growing out of it."). Nevertheless, out of an abundance of caution and for the sake of completeness, the Court will briefly address the merits of a hostile work environment claim.

As her basis for her sexual harassment/hostile environment claim, plaintiff states that "[t]he sexual harassment and hostility was ongoing since 2007 the date identified by Frank Behlau as the beginning of 'conflict' with Plaintiff to the date that she was separated December 2010 and in all likelihood would have continued into the future but for her separation." (ECF 46-1, at 22). Plaintiff alleges that Cowhey did not take any actions to remedy the harassment and hostility Behlau displayed to plaintiff. As support for her claim, plaintiff refers to the fact that plaintiff's name appeared on the list Behlau sent to Cowhey under the captions of "Who I've had conflict with "Who I don't Like." (ECF 46-20). Plaintiff also testified that Behlau "yelled" at her at a meeting in 2009 and later "interrupted her during senior management meetings, did not recognize her existence, failed to say hello and failed to be courteous." (Pugliese Dep. at 207-208).

To establish a hostile work environment claim, a plaintiff must establish that: (1) she suffered intentional discrimination because of her [sex]; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her' (4) the discrimination would detrimentally affect a reasonable person of the same [sex]; and (5) there is a basis for employer liability. Andreoli v. Gates, 482 F.3d 641, 643 (3d Cir. 2007). "Offhand comments and isolated incidents (unless extremely serious) are not sufficient to sustain a hostile work environment claim." Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998). Rather, the "conduct must be extreme to amount to a change in the terms and conditions of employment. . . " Id.

In this case, plaintiff has failed to submit evidence that would account for a single incidence of sexual harassment, let alone evidence of a severe and pervasive nature. The fact that Behlau may have had a conflict with plaintiff and did not like plaintiff hardly constitutes

35

The decision not to replace any of the three remaining division directors with plaintiff seemed entirely reasonable and fact-based. Plaintiff testified that her area of expertise was on urban areas. (Pugliese Dep., 473-474). Indeed, in an e-mail to Cowhey, plaintiff stated that she is an "urban planner exclusively, with a particular focus, in terms of education and experience, on the social and economic aspects of urban development and redevelopment. . . I also have a strong background in demographic and socio-economic research as related to analyzing community trends." (ECF 41-24). Plaintiff clearly did not have the expertise or extensive experience that any of the other three division directors had in their respective divisions. Plaintiff testified that she had not conducted any formal transportation planning, had never performed any type of formal planning work with respect to land use and development and that she did not have any experience conducting formal historic preservation or historic planning. (Pugliese Dep., 33, 34). In short, while plaintiff certainly possessed certain skills and strengths, her skills were not so extraordinary as to justify her displacing any of the remaining three Division directors.

Finally, plaintiff has asserted an aiding and abetting discrimination claim against defendants Cowhey and Martin under section 955(e) of the PHRA which forbids "any person, employer, employment agency, labor organization, or employee to aid, abet, incite, compel or coerce the doing of any act declared by this section to be an unlawful discriminatory practice." 43 Pa.Cons.Stat.Ann § 955(e).

In order to establish such a claim, plaintiff "must allege that an individual defendant

---

intentional discrimination based on sex. Such incidents occur in every workplace in America. Nor does yelling at plaintiff or being rude to her constitute sexual harassment. Title VII "does not set forth a general civility code for the American workplace." Burlington N. & Santa Fe Railway Co. v. White, 548 U.S. 53, 68 (2006).

actively or affirmatively participated in or compelled the discriminatory conduct." Wilson v. Children's Musuem of Pittsburgh, 2006 U.S. Dist. LEXIS 28978, *7 (W.D. Pa. 2006)(citing Dici v. Commonwealth of Pennsylvania, 91 F. 3d 542 (3d Cir. 1996)).

Since there is no evidence of any discriminatory conduct on the part of any defendant, judgment will be entered in favor of the defendants on this claim.